O

# United States District Court
# Central District of California

VIDA ENTERPRISE CORPORATION,

Plaintiff,

v.

ANGELINA SWAN COLLECTION, INC.,

Defendant.

Case № 2:22-cv-00915-ODW (JCx)

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [34]**

## I.    INTRODUCTION

Plaintiff Vida Enterprise Corporation holds the ANGELINA and SWAN trademarks, which it uses in connection with the sale of hats, socks, and other clothing items.   Vida brings suit against Defendant Angelina Swan Collection ("ASC"), alleging that ASC infringed Vida's marks by selling geles, a type of headwear, with the ANGELINA SWANN mark.   ASC now moves for summary judgment on the grounds that there is no genuine dispute regarding the likelihood of consumer confusion. (Mot. Summ. J. ("Motion" or "Mot."), ECF No. 34.)   The Court carefully considered the papers filed in connection with the Motion and deemed the matter appropriate for decision without oral argument.   Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.   For the following reasons, the Court **GRANTS** ASC's Motion.

## II.     BACKGROUND

The following facts are taken from ASC's Statement of Uncontroverted Facts and Vida's Statement of Genuine Disputes.   (Def.'s Statement of Uncontroverted Facts ("SUF"), ECF No. 34-3; Pl.'s Statement of Genuine Disputes ("SGD"), ECF No. 35-27.)  In setting forth these facts, the Court accepts as undisputed any supported fact of ASC's for which Vida does not provide contrary evidence.  *See* C.D. Cal. L.R. 56-3 ("[T]he Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are . . . controverted by declaration or other written evidence.").  In particular:

- Vida disputes the sale price of its hats by asserting that "[t]he products vary in prices and may cost more or less," and provides a single pincite to forty-seven pages of Exhibit H without stating exactly how much more or less the hats cost. (SGD 9.)  Setting aside, for now, the more fundamental issues with Exhibit H, the Court will not sift through a voluminous record to find evidence in support of an incomplete contention.  *Hochroh v. Ally Bank*, 461 F. Supp. 3d 986, 998 (D.  Haw.  2020)  ("[I]n  multiple  instances,  Plaintiff  did  not offer pinpoint citations . . . . [T]he Court will not comb through the needlessly voluminous  record  to  determine  what  evidence  supports  Plaintiff's  factual assertions.").   The Court deems the price of the hats as asserted by ASC undisputed for the purpose of this Motion.

- Vida disputes the sale price of a 12-pack of its socks by arguing that it sells socks that cost up to $34.99 "per pack," (SGD 10), but its evidence does not indicate how many socks are in the packs that cost $34.99,  (*see* Ex. H at 39, ECF Nos. 35-9 through 35-16).  The Court deems the price of a 12-pack of socks as asserted by ASC undisputed for the purpose of this Motion.

**A.** **Vida**

Vida sells men's, women's, and children's clothing on Amazon.com and in big box stores such as Wal-Mart. (SUF 5.) Vida is the owner of the ANGELINA mark, U.S. Trademark Reg. Nos. 1,687,176 and 4,399,571 ("the '571 Registration"). (SUF 7.) The '571 Registration is for:

> Clothing and accessories, namely, bandeau, tank tops, dresses, skirts, tutus, thermal tops, leggings, skirted leggings, pajamas, t-shirts, gloves, beanies, hats, scarves, earmuffs, headbands, arm warmers, leg warmers, boot socks, boot covers, slipper socks, footies and bra straps; underwear, bras, panties, slips, a-shirts, teddies, lingerie, corsets, girdle, body shapers and undershirts; hosiery, socks, stockings, pantyhose, tights, bodystockings, bodysuits.

(SUF 8.) Vida sells ANGELINA-branded hats and beanies that retail for about $23 for a pack of six hats. (SUF 9.)

Vida also owns the SWAN mark, U.S. Trademark Reg. No. 2,879,617, for underwear and socks. (SUF 6.) Vida's SWAN brand socks retail for around $18 for a 12-pack. (SUF 10.)

Vida maintains a Facebook page that is oriented toward wholesale buyers. (*See* Ex. H at 26 ("Vida Facebook Page") (indicating that "[w]e supply to wholesalers and retail/chain stores" and encouraging such persons to "[g]et your exclusive VIDA online wholesale buyer's account today").) Additionally, Vida sells ANGELINA-branded clothing (and only ANGELINA-branded clothing) directly to consumers through its website, angelina.shop.[1] (Opp'n 12, ECF No. 34.) To market its ANGELINA-branded clothing, Vida maintains an Instagram presence under the

---

[1] The evidence on this point comes from Exhibit H and is unconvincing for reasons discussed later in this Order. To the extent necessary to rule on this Motion, the Court takes judicial notice of the existence of angelina.shop, an online store that sells ANGELINA-branded clothing directly to site visitors. *Cf. Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 762 (C.D. Cal. Sept. 28, 2015) ("Courts may take judicial notice of the fact that an internet article is available to the public, but it may not take judicial notice of the truth of the matters asserted in the article.").

handle @follow.angelina and a Pinterest page under the handle @angelina.shop.  (*See* Ex. H at 26–27.)[2]

**B.    ASC**

ASC makes and sells only one type of product: the gele.  (SUF 1.)  Gele is a Yoruba (Nigerian) word for "head wrap" or "head tie."  (SUF 2.)  An example of a gele sold by ASC is pictured here:



(Mot. 5.)  ASC sells geles under the ANGELINA SWANN mark at a price of $140 to $520 each.  (SUF 3–4.)  (ASC's trademark contains two Ns in "SWANN" even though the name of the corporation itself contains only one N in "Swan".)  ASC sells its products on its own website only, and it further markets its products by maintaining a presence on Facebook under the @AngelinaSwannUS handle.  (Opp'n 12; SUF 1; Decl. Alan C. Chen ISO Opp'n ("Chen Decl.") ¶ 1, Ex. A ("Angelina Swann Facebook Page"), ECF No. 35-2.)  According to the Angelina Swann Facebook Page, the brand also maintains a social media presence on Instagram, Pinterest, TikTok, and Twitter.  (*Id.*)  ASC does not sell its products in brick-and-mortar stores or on Amazon or similar outlets.  (SUF 1.)

---

[2] To the extent necessary to rule on the Motion, the Court takes judicial notice of the existence of these two social media accounts.  *See supra* n.1.

## C.      Trademark Dispute

At some point in the past, ASC filed a trademark application with the United States Patent & Trademark Office ("USPTO") for the ANGELINA SWANN wordmark and design for "women's hats and hoods." (Mot. 8; Decl. Gordon E. Gray ISO Mot. ("Gray Decl.") ¶ 4 Ex. 3 ("Notice of Opp'n"), ECF No. 34-1.)    On February 9, 2022, Vida filed an opposition to ASC's mark with the USPTO. (*See id.*) That same day, Vida filed the Complaint in the present matter, setting forth claims against ASC for (1) federal trademark infringement (15 U.S.C. § 1114); (2) false designation of origin (15 U.S.C. § 1125); (3) common law trademark infringement; and (4) unfair competition (Cal. Bus. & Prof. Code § 17200).  ASC answered, and the Court set a jury trial for May 23, 2023.  (Scheduling & Case Management Order 24, ECF No. 22.)  The USPTO proceedings have been suspended pending the outcome of this case.  (Gray Decl. ¶ 7 Ex. 6 ("Suspend Order"), ECF No. 34-1.)

On February 6, 2023, ASC moved for summary judgment on the grounds that it is beyond genuine dispute that there is no likelihood that consumers will be confused about the origin of its geles.  (Mot. 7, 12.)  The Motion is fully briefed.  (Opp'n; Reply, ECF No. 46.)

## III.      LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" where the resolution of that fact "might affect the outcome of the suit under the governing law," and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, and the moving party may meet this burden with arguments or evidence or both.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics*, *Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). The non-moving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Franciscan Ceramics*, 818 F.2d at 1468 (quoting *Anderson*, 477 U.S. at 250) (emphasis omitted). Provided the moving party has satisfied its burden, the court should grant summary judgment against a party who fails to present evidence establishing an essential element of its claim or defense when that party will ultimately bear the burden of proof on that claim or defense at trial. *See Celotex*, 477 U.S. at 322.

In ruling on summary judgment motions, courts draw all reasonable inferences in the light most favorable to the nonmoving party, refraining from making credibility determinations or weighing conflicting evidence. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hous. Rts. Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1183 (C.D. Cal. 2004). However, "uncorroborated and self-serving" testimony will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)). "Conclusory" or "speculative" testimony is likewise "insufficient to raise genuine issues of fact and defeat summary judgment." *See Sterling*, 404 F. Supp. 2d at 1183. The nonmoving party must provide more than a "scintilla" of contradictory evidence to avoid summary judgment. *Anderson*, 477 U.S. at 251–52; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## IV.    EVIDENTIARY MATTERS

There are two preliminary evidentiary matters to address: ASC's evidentiary objections and Vida's Exhibit H.

**A.     ASC's Evidentiary Objections**

ASC objects to the introduction of eleven exhibits Vida offers in support of its opposition to ASC's Motion: Exhibits A–C, G, I, J, K, and O–R.  (Objs., ECF No. 47.)

Exhibit R is a sealed document containing some of Vida's sales data.  (Chen Decl. Ex. R ("Vida Sales Data"), ECF No 37-1 (sealed).)  ASC objects to Exhibit R on the grounds that, among other things, the Exhibit is unauthenticated.  (Objs. 3.)

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Civ. P. 901(a).  Under this standard, where counsel does not have personal knowledge of the authenticity of the document, a declaration of counsel cannot serve to authenticate the document.  *ART Microelectronics Corp., v. Diamond Antenna & Microwave Corp.*, No. 2:22-cv-08731-VAP (GJSx), 2020 WL 10432456, at *2 (C.D. Cal. Nov. 18, 2020); *see Latman v. Burdette*, 366 F.3d 774, 786–87 (9th Cir. 2004), *abrogated on other grounds by Law v. Siegel*, 571 U.S. 415 (2014) (holding that it was error to admit bank account records attached to an attorney declaration because the attorney had no personal knowledge regarding the authenticity of the records and relied on third party information).

Here, Vida fails to authenticate Exhibit R because the only authenticating evidence for Exhibit R is a declaration of counsel stating that it is a "true and correct copy of Vida's Financials."  (Chen Decl. ¶ 18, ECF No. 35-1.)   Without more, the Court cannot conclude that Vida's counsel has sufficient knowledge of Vida's own business records to verify that Exhibit R accurately reflects Vida's business data. Moreover, Vida makes no suggestion anywhere in its Opposition that a principal or employee of Vida will be available at trial to testify about any subject, including authentication of Vida's records.  In addition to this deficiency, the authentication statement is conclusory, lacks detail, and would likely fail to authenticate Exhibit R

even if the declarant were Vida's custodian of records.  The Court **SUSTAINS** ASC's objection to Exhibit R for lack of authentication.

The Court **OVERRULES** ASC's remaining objections, finding them to be without merit.  In particular, and without limitation, where ASC objects on the basis that Vida did not timely disclose evidence, ASC does not demonstrate that Vida's failure to produce such evidence caused it prejudice or harm.

**B.    Vida's Exhibit H**

As another preliminary matter, much of Vida's opposition to this motion, including its dispute of several of ASC's purportedly undisputed facts, rests on Exhibit H to the Declaration of Alan C. Chen.  According to Chen, counsel of record for Vida, Exhibit H is "a true and correct copy of the marketing materials used by Vida to show its use of the ANGELINA and SWAN marks in commerce, including use on annual print catalogs, brochures, newspapers, events, television, Amazon.com and Vida's own website at www.angelina.shop."  (Chen Decl. ¶ 8.)

Exhibit H evades easy description.  The seventy-seven pages of the Exhibit are unnumbered, and the CM/ECF ribbon at the top of the courtesy copy restarts its pagination several times, rendering it useless for checking Vida's pinpoint citations.  The digital version of the filing provides no further assistance; on CM/ECF, Exhibit H is parsed out into eight further subparts, each of which has its own ECF number (ECF Nos. 35-9 through 35-16).  These individual subparts lack pagination, leaving the Court to continue to guess at how to match the page numbers in Vida's Opposition and Statement of Genuine Disputes to the appropriate pages in Exhibit H.

Regarding the content of Exhibit H, the first dozen or so pages appear to be flyers advertising Vida's brick-and-mortar location in Los Angeles.  The next several pages appear to be clippings from one or more of Vida's catalogs.  There is also a photograph of a group of people in a store, a snapshot of a print newspaper article, and several dozen pages of printouts from Vida's own website and Amazon.com.  The exhibit lacks any sort of index describing the nature of each document, nor is there

any additional declaration providing further authentication for each item.  To top it off, Vida cites to the *entirety* of Exhibit H no less than seven times—five times in the Opposition, (Opp'n 1, 4, 9, 12, 17), and twice in the SGD, (SGD 5, 15)—leaving the Court to guess at exactly which of the exhibit's seventy-seven pages supports the proffered fact.

This is not the way to present evidence to the Court.  Vida's Exhibit H is utterly unauthenticated, unorganized, and unusable.   For these reasons, the Court can properly, and does, disregard Exhibit H.  *See Premier Constr. & Remode, Inc. v. Mesa Underwriters Special Ins. Co.*, No. 5:18-cv-02852-JGB (KKx), 2020 WL 5498072, at *2 (C.D. Cal. July 8, 2020) (striking exhibits and other documents, noting "Plaintiffs dump this heaping mess outside of chambers and leave the Court to muddle through their briefs' dreamlike associations, which also fail to reference the relevant charts or the record").

With  Exhibit H disregarded, many of Vida's arguments regarding trademark infringement lack basis in the record, further weakening its opposition to the Motion. Even so, the Court analyzes the Motion in the alternative by considering Exhibit H to the best of its ability.   Under this approach, ASC remains entitled to summary judgment.

## V.      DISCUSSION

ASC moves for summary judgment on all four of Vida's claims on the ground that it is beyond genuine dispute that there is no likelihood of consumer confusion.

## A.    Claims for Trademark Infringement under Federal and State Law

To succeed on a trademark infringement claim, a plaintiff "must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011); *see* 15 U.S.C. § 1114; *see also Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (stating test for whether a trademark has been infringed is "whether an alleged

trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product").

The Ninth Circuit has acknowledged that claims for federal trademark infringement under the Lanham Act, state law trademark infringement, and unfair competition under California law based on trademark infringement are all "subject to the same legal standards." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012). The same is true of claims for false designation of origin. *JUUL Labs, Inc. v. Chou*, 557 F. Supp. 3d 1041, 1053 (C.D. Cal. 2021) "The ultimate test for all these claims is exactly the same as for trademark infringement: whether the public is likely to be deceived or confused by the similarity of the marks." *Id.* (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988)) (cleaned up).

In making their respective arguments, neither party makes any meaningful distinction among Vida's four claims, which is consistent with the foregoing case law. Both sides argue primarily about the issue of likelihood of consumer confusion, apparently agreeing that all of Vida's claims rise or fall together with the resolution of this issue. The Court therefore analyzes ASC's federal trademark infringement, federal false designation of origin, state common law trademark infringement, and state law unfair competition claims together, focusing primarily on whether the likelihood of consumer confusion is in genuine dispute.

**B.    *Sleekcraft* Factors**

The Ninth Circuit "developed eight factors, the so-called *Sleekcraft* factors, to guide the determination of a likelihood of confusion." *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). These factors are (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark;

and (8) likelihood of expansion of the product lines.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

Courts apply the *Sleekcraft* factors flexibly; the "factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation*, 638 F.3d at 1145 (collecting cases).  "In the context of the Web in particular, the three most important *Sleekcraft* factors are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel." *GoTo.Com,* 202 F.3d at 1205.  "When this controlling troika or internet trinity . . . does not clearly indicate a likelihood of consumer confusion, a district court can conclude the infringement analysis only by balancing all the *Sleekcraft* factors within the unique context of each case." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir. 2002) (citation and internal quotation marks omitted).

The Court addresses each *Sleekcraft* factor below, but before it does, it is helpful to articulate with case-specific language Vida's central contention with regard to consumer confusion.  To win its suit, Vida must ultimately prove that a customer purchasing an ANGELINA SWANN-branded gele for over $140 from ASC's own website is likely to think that the gele they are purchasing is actually sold by Vida. The question on this Motion is whether Vida has demonstrated that it will have sufficient evidence to allow a reasonable jury to find a likelihood of consumer confusion on these facts.

In this case, stating the issue is almost tantamount to resolving it in ASC's favor.  It does not take a terribly detailed legal analysis to conclude that there is simply no appreciable chance that a customer buying an ANGELINA SWANN gele directly from ASC for hundreds of dollars might, at the time of the purchase, mistakenly think they are purchasing the gele from the same company that sells hats and scarves under the ANGELINA mark and underwear and socks under the SWAN mark in big-box retail stores and on Amazon.com for a few dollars apiece.  The

following analysis is guided by the eight *Sleekcraft* factors and gives additional nuance to this rather obvious conclusion.

    *1.    Strength of Mark*

First, the Court considers the strength of Vida's mark.  "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Network Automation*, 638 F.3d at 1149 (quoting *Brookfield Commcn's, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999)).  The strength of a mark depends on two considerations: its conceptual strength and its commercial strength. *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th Cir. 2011).

"A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers."  *Network Automation*, 638 F.3d at 1149 (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032–33 (9th Cir. 2010)).  "Conceptual strength involves classification of a mark 'along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.'" *Id.* (quoting *Brookfield*, 174 F.3d at 1058).  An "arbitrary" word mark neither describes nor suggests anything about the goods sold under the mark.  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:11 (5th ed. Mar. 2023 update).

Here, each of Vida's individual marks—ANGELINA and SWAN—qualifies as arbitrary.  The word or name "Angelina" does not in any way suggest, refer to, or describe the nature of hats, beanies, or other clothing items.  Similarly, the word "swan" does not suggest, refer to, or describe the nature of socks and underwear.  That a mark is arbitrary generally suggests it is strong, but courts must also consider the commercial strength of the mark.  *See SLY Mag., LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 437 (S.D.N.Y. 2007) ("A mark may be categorized as arbitrary

1    or fanciful, but may nonetheless lack commercial strength in the marketplace and
2    therefore ultimately be deemed weak."), *aff'd*, 346 F. App'x 721 (2d Cir. 2009).

3         Commercial strength refers to "the marketplace recognition value of the mark."
4    *Lahoti*, 636 F.3d at 508.   "Commercial strength is based on 'actual marketplace
5    recognition,' and thus 'advertising expenditures can transform a suggestive mark into
6    a strong mark.'"   *Network Automation*, 638 F.3d at 1149 (quoting *Brookfield*,
7    174 F.3d at 1058).  To show that its marks are commercially strong, Vida argues that,
8    from 2015 to 2020, it incurred over $2 million "for marketing expenses related to
9    trade shows, advertisements, [and] e-commerce, among others" and that it sold over
10   $400,000 in ANGELINA- or SWAN-branded beanie products in that same time
11   period.  (Opp'n 8.)

12        In the first place, the Court is excluding the evidence on which this argument is
13   based for lack of authentication.  (*See supra* Part IV.A.)  In the second place, even if
14   accepted as true, the mere fact that a party spent money on marketing does not mean
15   that its mark has gained commercial strength as a result.  It is true that "advertising
16   expenditures *can* transform a suggestive mark into a strong mark," *Brookfield*,
17   174 F.3d at 1058 (emphasis added), but something more is required, such as a
18   showing that the "mark has achieved actual marketplace recognition," *id.* (citing
19   *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743–44 (2d Cir. 1998)).  Here,
20   as in *Brookfield*, Vida provides only raw marketing expenditures without proffering
21   any further evidence or argument to show that those marketing expenditures resulted
22   in actual marketplace recognition.  A big marketing budget does not automatically
23   lead to marketplace recognition; the party claiming commercial strength must
24   demonstrate this causal connection with evidence.  Here, Vida has "has not come forth
25   with substantial evidence establishing the widespread recognition of its mark."
26   *Brookfield*, 174 F.3d at 1058.  Thus, there is no evidence of commercial strength.

27        In all, Vida's marks "fall[] within the weak side of the strength spectrum."  *Id.*
28   The first *Sleekcraft* factor weighs against a finding that consumer confusion is likely.

2.      *Proximity of Goods*

Second, the Court considers the proximity—that is, the similarity or relatedness—of the goods. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Network Automation*, 638 F.3d at 1150 (quoting *Brookfield*, 174 F.3d at 1055). "[T]he danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Id.* (quoting *Sleekcraft*, 599 F.2d at 350). "The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Id.*

Here, Vida sells a wide variety of ANGELINA-branded clothing products—including many of the thirty-nine types of clothing products listed in the '571 Registration. (*See* SUF 8.) Five of those types of clothing products—beanies, hats, scarves, headbands, and earmuffs—could fairly be characterized as headwear. There is some relation between these products and ASC's geles in that all these products are worn on the head. But the similarity ends there. Geles are a very specific type of headwrap. Vida may sell beanies, hats, scarves, headbands, and earmuffs, but it proffers no evidence suggesting that any of the headwear it sells bears any similarity to geles beyond the bare fact that they are all worn on the head.

The relation between ASC's geles, on one hand, and the underwear and socks Vida sells under its SWAN label, on the other hand is even weaker. The only similarity is that both sets of products are clothing items.

Moreover, ANGELINA- and SWAN-branded clothing items are low-priced everyday wearables, and ANGELINA SWANN-branded geles are expensive specialty headwear with unique designs. (SUF 2–3, 5, 9–10.) Thus, Vida's and ASC's goods are not sold to the same class of consumers and are somewhat dissimilar in use and function. This further decreases the proximity of the goods.

In opposition, Vida argues that the design of ASC's geles is not unique and that *other vendors* sell products that are similar to ASC's geles. (Opp'n 9–10.) This argument is not well taken. The relevant question is whether ASC's geles are similar to *Vida's* products. If they are, there may be a possibility that a consumer would be confused thinking that one of ASC's products is in fact Vida's product. This inquiry simply has nothing to do with whether ASC's geles are similar to other products sold by unrelated, nonparty vendors.

The discount clothing items Vida sells and the specific type of headwear ASC sells are related only in the barest conceptual way. The goods do not complement one another, are not sold to the same class of customers, and, beyond their facial similarity as clothing products, are dissimilar in use and function. The second *Sleekcraft* factor weighs strongly against a finding that consumer confusion is likely.

### 3. Similarity of Marks

Next, the Court considers how similar ASC's mark is to Vida's marks. At the outset, the Court notes that the present case "involves a twist on the comparison of marks factor in the likelihood of confusion analysis." *Schering-Plough Healthcare Prods., Inc. v. Ing-Jing Huang*, 84 U.S.P.Q.2d 1323, 2007 WL 1751193, at *3 (T.T.A.B. 2007). In particular, Vida's marks are two separate, distinct marks (ANGELINA and SWAN), whereas ASC's mark is a single two-word mark (ANGELINA SWANN). ASC points this out and argues that as a result there is little to no similarity between ASC's mark, on one hand, and Vida's marks, on the other hand. (Reply 5–6.)

This raises the issue of whether Vida's two marks are "conjoint." *Schering-Plough*, 2007 WL 1751193, at *3. If they are, then Vida has a stronger argument that ASC's mark is similar to its own. As the Trademark Trial and Appeal Board explains:

> In order that opposer's marks may be considered together, two elements must be satisfied before traditional likelihood of confusion analysis can proceed. First, it must be established that the marks have been and are being used together on a single product or in marketing. *See H.D.*

*Hudson Manufacturing Co. v. Food Machinery and Chemical Corp.*, 230 F.2d 445, 109 USPQ 48 (CCPA 1956); and *Simoniz Company v. Hysan Products Company*, 142 USPQ 377 (TTAB 1964).  Further, it must be established that opposer's marks are used in such a fashion that it would be proper to combine them for purposes of comparison, that is, that they have been used and/or advertised conjointly in such a manner and to such an extent in connection with a single product that they have come to be associated together, in the mind of the purchasing public, as indications of origin for opposer's product.  *The Western Union Telegraph Company v. Graphnet Systems, Inc.*, 204 USPQ 971 (TTAB 1979) [FAX and GRAM marks v. FAX GRAM]; and *Mallinckrodt, Inc. v. CIBA-GEIGY Corp.*, 195 USPQ 665 (TTAB 1977) [KOBAN, TOBAZ and PO-SAN marks v. TOLBAN].

*Id.* at *4.   For example, in *Schering-Plough*, the Trademark Trial and Appeal Board found conjoint use of a brand name (DR. SCHOLL'S) and a product name (AIR-PILLO) where the two marks appeared extensively on the same product packaging, often adjacently, and in promotional contexts.  *Id.* at *5.

Applying this framework here, Vida's showing that its marks are conjoint is very weak.  Vida does not argue that it ever used the ANGELINA and SWAN marks on the same product.  Instead, Vida cites its Exhibit H to point to instances where it used its ANGELINA and SWAN marks together in marketing.  But, as discussed, the Court disregards Exhibit H, and accordingly disregards Vida's argument based on Exhibit H.

Were the Court to attempt to consider Exhibit H as evidence of conjoint use, it would encounter the same issues that support disregarding Exhibit H altogether.  The only places the Court could locate the two logos adjacent to one another are as follows:

- On the wall in the background of the photo mentioned above, which appears to be a photo of a group of people in a clothing store.  The photo is undated and was taken at an unknown location.  In that photo, five of Vida's logos are

displayed on the upper part of a wall, all in a row.  The SWAN logo appears on the left and the ANGELINA logo appears on the right.  (*See* Ex. H at 23.)

- On a few of the undated pages that appear to be catalog pages, like so:



(Ex. H at 19.)  Other of these catalog-type pages contain similar groups of logos in which the ANGELINA and SWAN logos are not adjacent to one another. (*See, e.g.*, Ex. H at 7.)  Further, the only pages on which the ANGELINA and SWAN marks appear together are undated.  (*See, e.g.*, Ex. H at 1.)  Surrounding pages are variously dated 2011, 2012, and 2015; these pages do not display both marks together.  (*See, e.g.*, Ex. H at 4.)

Based on these observations, Vida makes no meaningful showing that it used its two marks together at any particular time, whether in the past seven years or earlier. Moreover, it is not at all clear *what* the catalog-type pages that contain the two marks together are—flyers, catalog pages, website printouts, or otherwise.  Thus, there is no meaningful showing that *the public* ever saw these materials.  If the public never saw these materials, then Vida has no meaningful argument that the marks are conjointly used.

Even in the photo with the store wall, the order of the two marks is reversed. And again, the lack of authentication for this photo renders it nearly worthless from an evidentiary perspective.  The Court has no indication of how long these two logos were displayed together in the interior of some unspecified building, and the Court has no indication that any member of the public ever stepped inside the building.

For all these reasons, the Court concludes that Vida presents only a "scintilla" of evidence regarding conjoint use of its two marks.  *Anderson*, 477 U.S. at 252.  That

1   being the case, there is no similarity as a matter of law based on Vida's conjoint use of
2   its ANGELINA and SWAN marks.

3     The remaining issue is whether there is similarity between Vida's two separate
4   marks, on one hand, and ASC's single mark, on the other hand.  Vida's two marks are
5   separate marks, and there is no evidence that the two marks have ever been used in
6   connection with the sale of the *same* article of clothing.  By contrast, ASC's mark has
7   always been used as a single, two-word mark.  Additionally, Vida's SWAN mark
8   contains one N in the word SWAN, whereas ASC's ANGELINA SWANN mark
9   contains two Ns in the word SWANN.  Thus, as a matter of law, the two sides' marks
10  are not similar.  If it does not altogether resolve the consumer confusion issue in
11  ASC's favor, the third *Sleekcraft* factor weighs strongly against a finding that
12  consumer confusion is likely.

13     *4. Evidence of Actual Confusion*

14    The next issue is whether there is evidence of actual confusion.  When
15  trademarks on goods are at issue, evidence of actual confusion can come in the form
16  of consumer surveys, *see Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252,
17  1264–65 (9th Cir. 2001), consumer testimony, *see id.*, or evidence that customers
18  bought one seller's product thinking they were buying that of another seller, or that
19  the customer contacted the wrong company, *see, e.g.*, *Comphy Co., Inc. v. Comfy
20  Sheet*, No. 2:20-cv-03029-ODW (Ex), 2021 WL 5051929, at *5 (C.D. Cal. Nov. 1,
21  2021).

22    Vida does not dispute that it has no evidence of actual confusion about the
23  marks at issue.  (SUF 16.)  Vida argues that the reason there is no evidence of actual
24  confusion is because ASC is a relatively new business with a short history of
25  operation.  (Opp'n 11.)  But Vida concedes that ASC was using the ANGELINA
26  SWANN mark on the internet by no later than early 2022.  (*Id.*)  Vida filed its
27  opposition to ASC's Motion in late February 2023.  A year is ample time for
28  consumer confusion to arise if such confusion is likely.  If there is no evidence of

confusion after a year, this observation itself weighs against there being a likelihood of consumer confusion.

Overall, the absence of evidence of actual confusion in this case weighs against a finding that consumer confusion is likely.

### 5. *Marketing Channels Used*

The next consideration is the similarity of the parties' marketing channels. "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. "If the plaintiff's and defendant's [goods] are likely to be sold in the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion." Ninth Circuit Model Civil Jury Instruction No. 15.18(6).

Here, ASC markets and sells its geles through its own website (angelinaswann.us and angelinaswann.com) and it further markets its products on social media platforms, including Facebook and ostensibly others, using @AngelinaSwannUS and similar handles. (SUF 1; Angelina Swann Facebook Page.)

Vida, for its part, markets and sells its ANGELINA branded clothing products through its own website (angelina.shop) and it further markets those products on its Instagram and Pinterest pages under the handles @follow.angelina and @angelinaonline.shop, respectively. (Opp'n 12; Ex. H at 26–27.) Vida has its own corporate Facebook page, which is apparently oriented toward wholesale buyers. (*See* Vida Facebook Page.)

In light of these observations, the only senses in which the parties' marketing channels might overlap are that (1) the parties each sell their own products directly to consumers on their own websites; (2) Vida has an Instagram page for its ANGELINA-branded clothing, and ASC has an Instagram page for its ANGELINA SWANN-branded geles; and (3) Vida has a corporate Facebook page for wholesale purchasers and ASC has a Facebook page for its ANGELINA SWANN-branded geles.

To the extent these marketing channels overlap, the overlap is minimal, such that any overlap is unlikely to cause consumer confusion.   First, a substantial

percentage of providers of goods maintain their own websites where they sell those goods to customers.  Thus, the mere fact that two sellers each use their own webpages to sell their goods or services does not, without more, suggest consumer confusion.  Second, Vida has not explained how the fact that two companies each have their own Instagram page is apt to create confusion in consumers.  And third, the fact that Vida has a Facebook page oriented toward wholesale buyers (ostensibly for all its brands, not just ANGELINA and SWAN) while ASC has a Facebook page oriented toward retail customers seeking to buy ANGELINA SWANN-branded geles engenders no colorable likelihood of confusion.  The audience each page serves and the products each page offers are too dissimilar.

Moreover, Vida distributes its products on Amazon.com and in big-box stores such as Walmart, whereas ASC does not make its geles available for sale in any physical stores.

In all, it appears that the parties' respective marketing channels are substantially *divergent*, not convergent.  Thus, the fifth *Sleekcraft* factor weighs strongly against a finding that consumer confusion is likely.

### 6.   Likely Degree of Care Exercised by Purchaser

The Court next considers the degree of care a potentially confused purchaser is likely to exercise.  In this case, the Court is considering the degree of care likely to be exercised by a purchaser of ASC's geles.

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution."  *Network Automation*, 638 F.3d at 1152.  "[W]hen the goods are expensive, the buyer can be expected to exercise greater care in [their] purchases."  *Sleekcraft*, 599 F.2d at 353; *see also* Ninth Circuit Model Civil Jury Instruction No. 15.18(7) ("The more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may

be."). "Low consumer care . . . increases the likelihood of confusion." *Network Automation*, 638 F.3d at 1152.

Here, ANGELINA SWANN-branded geles are expensive, so the purchaser of can be expected to exercise greater care. Such a purchaser can be expected to do substantial due diligence before purchasing, including, at minimum, by verifying that the product they are purchasing is from their intended source. Thus, the degree of consumer care is high.

Pushing back, Vida again cites to third-party products and pricing. (Opp'n 16–17.) But the reasonable consumer at issue is not one seeking to purchase third-party geles sold at discount prices. Instead, it is one seeking to purchase ASC's geles. Such a consumer is likely to exercise a high degree of care due the prices ASC charges. Accordingly, the sixth *Sleekcraft* factor weighs strongly against a finding that consumer confusion is likely.

### 7. *Defendant's Intent in Selecting Mark*

The Court next considers whether ASC had a culpable intent in selecting its ANGELINA SWANN mark. "Adopting a designation with knowledge of its trademark status permits a presumption of intent to deceive." *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999). "In turn, intent to deceive is strong evidence of a likelihood of confusion." *Id.*

In satisfaction of its initial burden, ASC points out that Vida has no evidence that ASC intended to trade on the goodwill of Vida's ANGELINA or SWAN trademarks. (Mot. 12; SUF 17.)

Vida makes a smattering of points on the issue of ASC's intent, but none of those points go to whether ASC knew of Vida's marks when it selected its own mark. Vida first points to the allegations in its Complaint, which are, of course, not evidence. (Opp'n 14.) Vida then sets forth a timeline of events relating to ASC's registration of its trademark and its websites. (*Id.* at 15.) From there, Vida leaps to the suggestion that ASC's timeline constitutes "curious conduct and [a] roundabout

way of registering for a business," which it argues "can only be interpreted as [ASC's] acute awareness of the risk of confusion inherent in use of ANGELINA SWAN as the company's official trademark." (*Id.*)  Both these leaps are factually unsupported and logically untenable.  Moreover, the question is not whether ASC was aware of the "risk of confusion" in a general sense when it selected its ANGELINA SWANN mark.  The question is whether ASC was aware of Vida's marks.  Vida makes no showing of the latter.  Accordingly, in balancing the *Sleekcraft* factors, the seventh factor is neutral.

### 8. *Likelihood of Expansion of Product Lines*

Finally, the Court considers the likelihood of an expansion of either party's product lines.  "[I]nasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand [their] business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354.  Here, the question is whether there is any evidence that Vida might expand into the high-end gele market or that ASC might expand into the market for the sort of everyday discount men's and women's clothing Vida sells.

ASC points out that Vida has no evidence that it intends to sell geles. (Mot. 12.)  In response, Vida suggests that geles "may fall into Vida's natural zone of expansion," and cites a financial record showing recent sales totals for SWAN-branded hats and beanies.  (SGD 18.)  Again setting aside the fact that the Court is excluding the financial record, (*see supra* Part IV.B), the financial record nevertheless falls far short of evidence that Vida is likely to expand into selling geles.  A single financial summary regarding past sales of hats and beanies says nothing about whether Vida is likely to start selling geles at some point in the future.

Moreover, if any director, officer, or employee of Vida is contemplating selling geles in the future, Vida would be able to produce a declaration indicating as much. But the only declaration Vida submits with its opposition is that of its attorney, and

the attorney declaration does not say anything about this issue.  (*See generally* Chen Decl.)  Vida neither points to nor suggests any other meaningful evidence it might introduce to make a showing of likelihood of expansion at trial.

Additionally, no party suggests it is possible that ASC, which specializes in geles, will expand its product line to anything beyond geles.

Given that no evidence suggests a likelihood that one side will expand into the product lines of the other, the eighth and final *Sleekcraft* factor weighs against a finding that consumer confusion is likely.

**C.   Summary**

In summary, of all the *Sleekcraft* factors, the only one that may weigh in favor of confusion is the conceptual strength of Vida's marks.  But this showing, without more, does not demonstrate a likelihood of confusion.  This is especially so when, as here, six of the seven remaining factors indicate no likelihood of confusion, often strongly.   In these circumstances, the *Sleekcraft* factors, on the whole, weigh so strongly in ASC's favor that the Court concludes that no reasonable jury could find for Vida on the consumer confusion issue.  Because all four of Vida's claims rise or fall with this issue, ASC is entitled to judgment in its favor as a matter of law.

**VI.    CONCLUSION**

For the reasons discussed above, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DISMISSES** Vida's Complaint **WITH PREJUDICE**.  (ECF No. 34.)  The Court will issue Judgment.

**IT IS SO ORDERED.**

April 11, 2023

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**
